## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Gwendolyn Calla Moore, derivatively on behalf of SLEEP NUMBER CORPORATION,<br><br>    Plaintiff,<br>v.<br><br>JEAN-MICHEL VALETTE, SHELLY IBACH, BARBARA MATAS, BRENDA LAUDERBACK, DANIEL ALEGRE, DEBORAH KILPATRICK, JULIE M. HOWARD, KATHLEEN L. NEDOROSTEK, MICHAEL HARRISON, STEPHEN L. GULIS, JR., DAVID CALLEN, and KEVIN K. BROWN,<br><br>    Defendants,<br><br>SLEEP NUMBER CORPORATION,<br><br>    Nominal Defendant. | **CASE NO.**<br><br><br><br>**JURY TRIAL DEMANDED** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Gwendolyn Calla Moore ("Plaintiff"), by her undersigned attorneys, derivatively on behalf of Nominal Defendant Sleep Number Corporation ("Sleep Number" or the "Company") files this Shareholder Derivative Complaint against Defendants Jean-Michel Valette, Shelly Ibach, Barbara Matas, Brenda Lauderback, Daniel Alegre, Deborah Kilpatrick, Julie M. Howard, Kathleen L. Nedorostek, Michael Harrison, Stephen L. Gulis, Jr., David Callen, and Kevin K. Brown (collectively, the "Individual Defendants") for violation of breaches of their fiduciary duties as directors and/or officers of Sleep Number, unjust enrichment, waste of corporate assets, violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution Sections 10(b) and 21D of the Exchange Act.

1

Plaintiff alleges the following against the Individual Defendants based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through her attorneys, which included, among other things, a review and analysis of: (i) public documents, transcripts of conference calls and announcements made by Defendants, (ii) United States Securities and Exchange Commission ("SEC") filings, (iii) wire and press releases published by and regarding Sleep Number news reports, (iv) securities analysts' reports and advisories about the Company, (v) information readily obtainable on the Internet, and (vi) public filings in the related federal securities class action lawsuit action filed in the United States District Court for the District of Minnesota, captioned *Steamfitters Local Pension Ret. Security Funds v. Sleep Number Corp. et al.*, 0:21-cv-02669 (the "Securities Action"). Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought in the right, and for the benefit, of Sleep Number against certain of its officers and directors seeking to remedy Defendants' violations of law that have occurred from February 18, 2021 through July 20, 2021 (the "Relevant Period") and have caused, and continue to cause, substantial harm to Sleep Number and its shareholders, including monetary losses and damages to Sleep Number's reputation and goodwill.

2.      Sleep Number is a Minnesota Corporation based in Minneapolis, Minnesota.

3.      Sleep Number is a designer, manufacturer, marketer, retailer, and servicer of a line of Sleep Number beds. The Company's Sleep Number bedding collection features a full line of sleep products designed to improve sleep comfort and quality.

4.      Beginning February 18, 2021 and throughout the Relevant Period, the Individual Defendants made, or caused the Company to make, materially false and misleading statements in press release and Securities Exchange Commission filings concerning Sleep Number's business, inventory, supply chain, and prospects. Specifically, they issued positive financial information and optimistic guidance, and made false assurances that the Company had no material problems with its supply chain, all while officers and directors were dumping a substantial amount of Sleep Number stock at artificially inflated prices.

5.      Sleep Number is a vertically integrated company, which claims to eliminate the need for outside entities such as manufacturers, transportation, or other logistical necessities. Due to this business model, Sleep Number was poised to have profitable growth in the future and touted such prospects.  For instance, on February 18, 2021, Sleep Number published a press release and filed a Form 8-K with the SEC stating "[w]ith strong momentum in the first quarter and ongoing investments in sleep science-based innovations and digital technologies, we are well positioned to generate sustainable profitable growth for years to come."

6.      This was not the case.  This press release, SEC filing, and other statements like it were false, misleading, and failed to reveal that Sleep Number did not have adequate supplies on hand to meet demands for orders and therefore was at risk from a disruption in the foam supply chain that due to Winter Storm Uri Sleep Number could not fulfill orders thereby losing revenue. As a result of this foam shortage and supply chain disruption, sales and earnings suffered, as the Company failed to meet consumer demand, and Sleep Number was forced to delay mattress shipments to consumers, risking millions of dollars' worth of sales.

7.      These setbacks persisted despite the Individual Defendants touting the resiliency of their vertical integration strategy and assuring investors that they have "taken measures to

mitigate the impact of a potential supply disruption." But they never disclosed that severe chain disruptions had already occurred and undermined Sleep Number's sales results and ability to meet demand surges.

8.    Throughout the Relevant Period, the Individual Defendants made materially false and misleading statements and omissions regarding (i) Sleep Number's ability to fill orders from its supply on hand; (ii) Sleep Number's supply chain for foam was severely disrupted as a result of Winter Storm Uri; (iii) that Sleep Number's vertical integration supply chain flexibility, redundancies, and fail-safes, if any, were insufficient to overcome the foam supply disruption caused by Winter Storm Uri; and (iv) without a reliable source of foam, the Company was unable to timely fulfill client orders.

9.    This information went undisclosed during the Relevant Period. Instead of disclosing this material information, the Individual Defendants touted that Company's business operations were free of internal disruptions and had redundancies and fail-safes to prevent unforeseen circumstances, like supply chain disturbances.

10.    On July 20, 2021, Sleep Number issued a press release announcing its financial results for its second fiscal quarter ended June 30, 2021. The release revealed that Sleep Number had missed consensus estimates on the top and bottom line for the quarter and again blamed the disappointing results in significant part on "near-term supply constraints" and component shortages.

11.    On this news, the price of Sleep Number stock fell nearly 13% in a single day to close at $97.78 per share on July 21, 2021, on an abnormally high volume of over 3 million shares traded.   Since then, the stock has continued to fall, down 27%.95 in the last six months and trading at $71.50 as of January 31, 2022.

12.     Making matters worse and before investors and the public learned of this crushing news, five of the Director Defendants Ibach, Valette, Alegre, Nedorostek, Harrison and two of the Officer Defendants Callen and Brown (collectively "Insider Trading Defendants") sold thousands of shares for millions of dollars before the supply chain disruptions were fully revealed while in possession of material non-public inside information regarding the Company's troublesome supply chain shortages.

13.     As a result of the foregoing, Sleep Number has been named a defendant in a federal securities class action lawsuit of investors who allege they were damaged when they purchased Sleep Number shares during the Relevant Period.

14.     The Securities Action has subjected the Company to internal investigations, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company. The Individual Defendants' wrongful conduct will likely cost the Company millions of dollars going forward.

15.     The Individual Defendants knowingly or recklessly breached fiduciary duties and caused other misconduct that substantially damaged the Company.

16.     Given the massive insider selling by at least six insiders and other misconduct, a majority of the Board of Directors ("Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence because there is a substantial likelihood that the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct are liable in this derivative action and the Securities Litigation.

## JURISDICTION AND VENUE

17.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and

5

section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder (17 C.F.R.§240.10b-5) promulgated thereunder by the SEC.

18.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 USC. §1367(a).

19.     This Court has jurisdiction over each defendant named herein because each is either a corporation that conducts business in and maintains operations in this District, is an individual residing in this District, and/or is an individual non-resident who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

20.     Venue is proper in this Court in accordance with 28 U.S.C. §1391 and §1401 because: (i) Sleep Number maintains its principal place of business in this District; (ii) one or more of the Defendants either resides in or maintains offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

21.     Plaintiff, Gwendolyn Calla Moore, is the appointed representative and attorney in fact for Matthew Gelb ("Stockholder"), a stockholder of Sleep Number common stock. Stockholder has continuously held Sleep Number common stock during the relevant period, has, and will continue to do so throughout the pendency of this litigation.

**Nominal Defendant**

22.     Nominal Defendant, Sleep Number is a Minnesota corporation with its principal executive offices at 1001 Third Avenue South, Minneapolis, MN, 55404. Sleep Number's shares trade on the NASDAQ under ticker symbol "SNBR."

**Director Defendants**

**Defendant Ibach**

23.     Defendant Shelly Ibach ("Ibach") is and was at all relevant times President, Chief Executive Officer and director of Sleep Number (2012-Present). According to the Company's Schedule 14A filed with the SEC on March 30, 2021 (the "2021 Proxy Statement"), Defendant Ibach beneficially owned 505,373 shares of the Company's common stock. Based upon the closing price of the Company's stock on February 26, 2021, Defendant Ibach beneficially owned $69,301,799.49 of Sleep Number common stock.

24.     For the fiscal year ended January 2, 2021, Defendant Ibach received $8,528,276 in compensation from the Company. This includes $746,200 in salary, $3,281,942 in stock awards, $1,006,152 in option awards, $3,439,043 in non-equity incentive plan compensation, and $54,939 in all other compensation.

25.     During the Relevant Period, Defendant Ibach made the following sales of Company stock:

| Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| March 2, 2021 | 10,000 | $145.22 | $1,452,200 |
| March 16, 2021 | 16,904 | $142.10 | $2,402,058.40 |
| March 21, 2021 | 2,118 | $143.83 | $304,631.94 |
| April 1, 2021 | 2,930 | $144.75 | $424,117.50 |
| | | **Total Proceeds** | $4,583,007.84 |

26.     The Company's 2021 Proxy Statement stated the following about Defendant

Ibach:

> President and Chief Executive Officer of Sleep Number Corporation since June 2012; Executive Vice President and Chief Operating Officer from June 2011 to June 2012; Executive Vice President, Sales & Merchandising from October 2008 to June 2011; Previously held various senior executive operations and merchandising roles at Macy's, Inc. and the Department Store Division at Target Corporation for more than 25 years. Ms. Ibach is Sleep Editor-at-Large for Thrive Global, serves on the executive committee of the Minnesota Business Partnership, and is the chairperson for the American Cancer Society's CEOs Against Cancer Minnesota chapter.

> Ms. Ibach brings leadership, experience and perspective as Sleep Number's President and CEO along with a dedication to sustainable, long-term growth and shareholder value. Ms. Ibach brings an intimate knowledge of our customer, culture, strategy, product, marketing, technology, operations and competitive environment gained during fourteen years in executive management with the Company. Ms. Ibach also brings more than two decades of retail experience with P&L oversight, brand and product development and customer-focused leadership experience with prominent national retailers.

### Defendant Valette

27.     Defendant Jean-Michel Valette ("Valette") is and was at all relevant times Chairman of the Board (2010-Present) and a director since 1994. According to the 2021 Proxy Statement, Defendant Valette beneficially owned 245,702 shares of the Company's stock. Based upon the closing price of the Company's common stock on February 26, 2021, Defendant Valette beneficially owned $33,693,115.26 of Sleep Number common stock.

28.     For the fiscal year ended January 2, 2021, Defendant Valette received $281,185 in compensation from the Company. This includes $208,769 in salary, $54,142 in stock awards, $18,154 in option awards, and $120 in all other compensation.

29.     During the Relevant Period, Defendant Valette made the following sales of Company stock:

| Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| April 5, 2021 | 25,000 | $137.69 | $3,469,154 |

| | |
|---|---|
| **Total** | $3,469,154 |

30.     The Company's 2021 Proxy Statement stated the following about Defendant Valette:

> Chairman of our Board since May 2010; Independent adviser to branded consumer companies; Currently serves as Lead Director of The Boston Beer Company and as a Director of Intertek Group plc; Served as Chairman of the Board of Directors of Peet's Coffee and Tea, Inc. from January 2004 to October 2012; Also served as non-executive Chairman of the Robert Mondavi Winery from April 2005 to October 2006 and was its Managing Director from October 2004 to April 2005; Head of Branded Consumer Equity Research and Branded Consumer Venture Capital Investments at Hambrecht & Quist LLC, an investment banking firm, during the 1980s and 1990s.
>
> Mr. Valette provides our Board with significant, relevant leadership and a proven track record of significant long-term shareholder value creation with multiple successful branded consumer growth companies as well as valuable perspective in guiding the company on strategy, financial performance and corporate governance practices.

**Defendant Alegre**

31.     Defendant Daniel Alegre ("Alegre") is and was at all relevant times a director of Sleep Number (2013-Present). In addition, Defendant Alegre is a member of the Management Development and Compensation Committee. According to the Company's 2021 Proxy Statement, Defendant Alegre beneficially owned 36,816 shares of the Company's stock. Based upon the closing price of the Company's common stock on February 26, 2021, Defendant Alegre beneficially owned $5,048,578.08 of Sleep Number common stock.

32.     For the fiscal year ended January 2, 2021, Defendant Alegre received $156,708 in compensation from the Company. This includes $84,412 in cash, $54,142 in stock awards, and $18,154 in all other compensation.

33.     During the Relevant Period, Defendant Alegre made the following sales of

Company stock:

| Date | Shares Sold | Price | Proceeds |
|------|-------------|-------|----------|
| May 25, 2021 | 12,852 | $107.55 | $1,382,232.60 |
| | | Total Proceeds | $1,382,232.60 |

34.     The Company's 2021 Proxy Statement stated the following about Defendant Alegre:

> President and Chief Operating Officer of Activision Blizzard, Inc., a leading interactive entertainment company, effective April 2020; Held various roles at Google, Inc., an innovative search and advertising company, from 2004 to March 2020, including President of Google Retail, Shopping and Payments, President of Global Partnerships, as well as President of Asia Pacific and Japan, overseeing all regional operations, and Vice President of Latin American and Asia Pacific Business Development; Previously, Mr. Alegre was Vice President at Bertelsmann, responsible for business development of its ecommerce division.

> Mr. Alegre provides our Board with valuable insight into mobile and technology platforms, digital brand building and advertising and e-commerce deployment and strategy, as well as extensive leadership in global operations and expansion, partner management and business development in technology and mass media industries

**Defendant Nedorostek**

35.     Defendant Kathleen L. Nedorostek ("Nedorostek") is and was at all relevant times a director of Sleep Number (2011-Present). In addition, Defendant Nedorostek serves on the Management Development and Compensation Committee and Nominating and Corporate Governance Committee. According to the Company's 2021 Proxy Statement, Defendant Nedorostek beneficially owned 46,651 shares of the Company's stock.  Based upon the closing price of the Company's common stock on February 26, 2021, Defendant Nedorostek beneficially owned $6,397,251.63 of Sleep Number common stock.

36.     During the Relevant Period, Defendant Nedorostek made the following sales of stock:

| Date | Shares Sold | Price | Proceeds |
|------|-------------|-------|----------|
| February 25, 2021 | 3,370 | $138.42 | $466,475.40 |
| February 25, 2021 | 4,000 | $138.09 | $552,360 |
| | | **Total Proceeds** | $1,018,835.40 |

37.     For the fiscal year ended January 2, 2021, Defendant Nedorostek received $157,296 in compensation from the Company. This includes $85,000 in salary, $54,142 in stock awards, and $18,154 in option awards.

38.     The Company's 2021 Proxy Statement stated the following about Defendant Nedorostek:

> Former Global CEO of Nine West Group, a division of Nine West Holdings, Inc., a leading global designer, marketer, and wholesaler of brands in apparel, footwear and accessories from April 2014 to September 2014; Group President, Global Footwear and Accessories at The Jones Group from October 2012 until April 2014; President of the North American Wholesale and Global Licensing divisions of Coach Inc. from 2003 to 2012.
>
> Ms. Nedorostek provides our Board with significant experience leading high-end, multi-national branded consumer products companies with both manufacturing and retail operations. Her experience includes strategic planning for global businesses, P&L oversight, organizational strategy and change management, product design, global licensing and distribution, brand marketing and real estate.

**Defendant Harrison**

39.     Defendant Michael Harrison ("Harrison") is and was at all relevant times a director of Sleep Number (2011-Present). Defendant Harrison serves on the Management Development and Compensation Committee and Corporate Governance and Nominating Committee.  According to the Company's 2021, Defendant Harrison beneficially owned 54,410 shares of the Company's stock.  Based upon the closing price of the Company's common stock on February 26, 2021, Defendant Harrison beneficially owned $7,461,243.30 of Sleep Number common stock.

11

40.     For the fiscal year ended January 2, 2021, Defendant Harrison received $171,780 in compensation from the Company. This includes $99,294 in salary, $54,142 in stock awards, and $18,154 in option awards.

41.     During the Relevant Period, Defendant Harrison made the following sales of stock:

| Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| February 19, 2021 | 3,469 | $118.48 | $411,007.12 |
| February 19, 2021 | 1,897 | $119.05 | $225,837.85 |
| | | Total Proceeds | $636,844.97 |

42.     The Company's 2021 Proxy Statement stated the following about Defendant Harrison:

Independent advisor to consumer brand companies. Since January 2020, he has served as Non-Executive Chairman of Seasalt Holdings, Ltd., a UK-based designer and retailer of apparel and accessories. Since January 2016, he has served on the board of OOFOS, a leader in the emerging category of recovery footwear for athletes, where he was previously Interim CEO from March 2014-May 2015. From August 2016 to January 2017, Mr. Harrison served as President & Chief Operating Officer of Grand Circle Corporation, a leader in overseas small group travel serving Americans aged 50 and older. From 2014-2016, Mr. Harrison served on the board of Totes Isotoner, a leading marketer of umbrellas, gloves, rainwear, slippers and other weather-related accessories. Held various roles at Timberland from 2003 through 2012, including Chief Brand Officer, Co-President, Senior Vice President of Worldwide Sales and Marketing, and as Senior Vice President International. Prior to joining Timberland, Mr. Harrison served in various executive, marketing, operations and general management capacities with Procter & Gamble - in Europe, U.S., Australia and Asia.

Mr. Harrison brings 30 years of business acumen to our Board from his senior executive experience in marketing, product design and development, retailing and international management with leading consumer brands.

**Defendant Matas**

43.     Defendant Barbara Matas ("Matas") is and was at all relevant times a director Sleep Number (2016-Present). In addition, Defendant Matas is Chairwoman of the Audit

Committee.

44.     For the fiscal year ended January 2, 2021, Defendant Matas received $172,796 in compensation from the company.  This includes $100,500 in fees earned, $54,142 in stock awards, and $18,154 in option awards.

45.     The Company's 2021 Proxy Statement stated the following about Defendant Matas:

> Former Managing Director and Chairman, Leveraged Finance, Citigroup Global Markets, Inc. from 2013 to 2016, and co-head from 2006 to 2013; From 1985 to 2006 Ms. Matas held various leadership positions in leveraged finance and high yield capital markets at Citicorp, Salomon Brothers and Citigroup; Ms. Matas began her career as an auditor at Touche Ross & Co.

> Ms. Matas brings to our board substantial expertise in capital structure and financial strategy gained through more than 30 years of professional experience in advising boards and management teams on capital markets, capital structure and risk assessment and management.

### Defendant Lauderback

46.     Defendant Brenda Lauderback is and was at all relevant times a director of Sleep Number (2004-Present). In addition, Defendant Lauderback is a member of the Management Development and Compensation Committee.

47.     For the fiscal year ended January 2, 2021, Defendant Lauderback received $172,062 in compensation from the Company. This includes $99,766 in fees earned, $54,142 in stock awards, and $18,154 in all other compensation.

48.     The Company's 2021 Proxy Statement stated the following about Defendant Lauderback:

> Former President of the Retail and Wholesale Group for the Nine West Group, Inc., a designer, and marketer of women's footwear and accessories, from May 1995 until January 1998; Previous roles include President of Wholesale and Manufacturing for US Shoe Corporation and more than 18 years in senior

merchandising roles at the Department Store Division of Target Corporation.

Ms. Lauderback provides our Board extensive leadership in merchandising, marketing, product development and design and manufacturing at prominent national wholesale and retail companies. Her breadth of experience as a Director on several other publicly traded company boards also provides our Board with significant insight into leading practices in executive compensation and corporate governance. Ms. Lauderback is a National Association of Corporate Directors (NACD) Board Leadership Fellow, having completed NACD's comprehensive program of study for Directors and corporate governance professionals. She supplements her skill sets through ongoing engagement with the Director community, and access to leading practices. Ms. Lauderback was selected as one of the top 100 Directors by NACD in 2017.

**Defendant Kilpatrick**

49.      Defendant Deborah L. Kilpatrick ("Kilpatrick") is and was at all relevant times a director of Sleep Number (2018-Present).  In addition, Defendant Kilpatrick serves on the Audit and Corporate Governance and Nominating Committees.

50.      For the fiscal year ended January 2, 2021, Defendant Kilpatrick received $157,769 in compensation from the Company. This includes $85,353 in fees earned, $54,142 in stock awards, $18,154 in option awards, and $120 in all other compensation.

51.      The Company's 2021 Proxy Statement stated the following about Defendant Kilpatrick:

Co-Chief Executive Officer and Executive Chairman of the Board of Evidation Health, Inc., a digital health company, since August 2020, and previously Chief Executive Officer from 2014 to August 2020; Currently on the board of directors for nonprofit The Task Force for Global Health and for privately held women's health companies NextGen Jane and Emme; Vice President of Market Development and Chief Commercial Officer of CardioDx, a genomic diagnostics company, from 2006 to 2014 with responsibility for sales, marketing and reimbursement from insurers; Held multiple leadership roles at Guidant Corporation, a Fortune 500 medical device company, from 1998 to 2006 (acquired by Boston Scientific), including Research Fellow, Director of R&D, and Director of New Ventures in the Vascular Intervention Division; Serves on the College of Engineering Advisory Boards for Georgia Tech and the California Polytechnic State University, and is a Fellow of the American Institute of Medical and Biological Engineering; Holds multiple patents in medical device technologies and

drug delivery devices; Advises multiple venture capital funds and privately-held startup companies in the digital health sectors.

Ms. Kilpatrick brings to our Board substantial expertise and experience in the development and commercialization of medical devices and digital health products, and a track record of successful product innovation to transform health care with big data in the genomic and digital era. With her deep understanding of digital health opportunities and passion for our sleep innovations, Ms. Kilpatrick's appointment to our Board supports our strategy of improving lives through individualizing sleep experiences and advancement of our SleepIQ technology platform

**Defendant Howard**

52.     Defendant Julie Howard ("Howard") is and was at all relevant times a director of Sleep Number (2020-Present). In addition, Defendant Howard serves as a member of the Management Development and Compensation Committee.

53.     For the fiscal year ended January 2, 2021, Defendant Howard received $146,111 in compensation from the Company. This includes $67,714 in salary and $54,142 in stock awards, $18,154 in option awards, and $6,601 in all other compensation.

Chief Executive Officer of Riveron, a national business advisory firm specializing in accounting, finance, technology, and operations, effective March 2021; Former Chief Executive Officer of Navigant Consulting, Inc. (Navigant), a specialized global professional services firm, from March 2012 to October 2019; Former Chairman of the Board of Navigant from May 2014 to October 2019; Previous leadership positions with Navigant include President (2006-2012), Chief Operating Officer (2003-2006) and Chief Human Capital Officer (2000-2003).

Ms. Howard provides our Board with significant strategic, financial and global expertise from her tenure as Chief Executive Officer and the other positions she held at Navigant. Ms. Howard also brings important board leadership and corporate governance experience from serving as the Chairman of the Board of Navigant and on other public company boards and their respective committees

**Defendant Gulis**

54.     Defendant Stephen Gulis, Jr. ("Gulis") is and was at all relevant times a director of Sleep Number (2005-Present).  In addition, Defendant Gulis serves on the Audit Committee.

55.     For the fiscal year ended January 2, 2021, Defendant Gulis received $157,228 in compensation from the Company. This includes $84,912 in salary, $54,142 in stock awards, $18,154 in option awards, and $20 in all other compensation. The Company's 2021 Proxy Statement stated the following about Defendant Gulis:

> Mr. Gulis provides our Board with extensive experience as a senior executive of a publicly traded consumer products company, including as a chief financial officer and treasurer with responsibility for capital stewardship, cash management, investor relations, as well as significant M&A activity and broad oversight of financial reporting and controls. Mr. Gulis also brings expertise in risk management, implementation of enterprise technology platforms, global operations, human resources, and product sourcing and quality directives.

**Non-Party Directors On The Board When This Complaint Was Filed**

### Angel L. Mendez

56.     Angel L. Mendez ("Mendez") has served as a director of the Company since January 2022.

### Phillip M. Eyler

57.     Phillip M. Eyler ("Eyler") has served as a director of the Company since January 2022.

**Officer Defendants**

### Defendant Callen

58.     Defendant David Callen ("Callen") is and was at all relevant times President and Chief Financial Officer of Sleep Number (2014-Present). According to the 2021 Proxy Statement, Defendant Callen beneficially owned 89,756 shares of the Company's stock. Based upon the closing price of the Company's stock on February 26, 2021, Callen beneficially owned $12,308,240.28 of Sleep Number common stock.

59.     For the fiscal year ended January 2, 2021, Defendant Callen received $2,423,237 in compensation from the Company. This includes $439,632 in salary, $841,410 in stock awards,

$253,023 in option awards, $878,434 in non-equity incentive plan compensation, and $10,738 in all other compensation

60.     During the Relevant Period, Defendant Callen made the following sales of Company stock:

| Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| March 21, 2021 | 7,042 | $138.42 | $974,753.64 |
| March 22, 2021 | 6,045 | $138.09 | $834,754.05 |
| | | Total Proceeds | $1,809,507.69 |

**Defendant Brown**

61.     Defendant Kevin K. Brown ("Brown") is and was at all relevant times an Executive Vice President and Chief Marketing Officer (January 2014–Present). For the fiscal year ended January 2, 2021, Defendant Brown received $1,778,996 in compensation from the Company. This includes $433,823 in salary, $424,530 in stock awards, $134,203 in option awards, $773,547 in non-equity incentive plan compensation, and $12,893 in all other compensation.  According to the Company's 2021 Proxy Statement, Defendant Brown had a $470,715 base salary as of March 22, 2020.

62.     According to the Company's 2021 Proxy Statement, Defendant Brown beneficially owned 67,895 shares of the Company's stock.

63.     During the Relevant Period, Defendant Brown made the following sales of Company stock:

| Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| February 19, 2021 | 10,650 | $122.36 | $1,303,134.00 |
| March 21, 2021 | 3,241 | $143.83 | $466,153.00 |
| | | Total | $1,769,287 |

**THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES**

64.     By reason of their positions as officers, directors and/or fiduciaries of Sleep

Number and because of their ability to control the business and corporate affairs of Sleep Number, the Individual Defendants owed Sleep Number and its shareholders' fiduciary obligations of trust, loyalty, good faith, and due care. The Individual Defendants were and are required to use their utmost ability to control and manage Sleep Number in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Sleep Number and its shareholders to benefit all shareholders equitably.

65.     Each director and officer of the Company owes Sleep Number and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company.

66.     As fiduciaries of Sleep Number, the Individual Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein because of their position and authority.

67.     The officers and directors of Sleep Number were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company to discharge their duties.

68.     Each Individual Defendant, under his or her position as a director and/or officer, owed to the Company and its shareholders the highest fiduciary duties of loyalty, good faith, care, and diligence in the management and administration of the affairs of the Company. As Sleep Number's directors and officers, the Individual Defendants knowingly acted with reckless disregard of their obligations as fiduciaries because their conduct posed a significant risk of harm to the Company.

69.     The Individual Defendants had a duty to prevent and correct the dissemination of erroneous, misleading, and deceitful information concerning, inter alia, the Company's

financial condition, supply chain, business operations, management, performance, growth, earnings, and business prospect. Moreover, as senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC, pursuant to the Exchange Act, Individual Defendants had a duty to act in the best interest of the Company. As fiduciaries, the Individual Defendants had a duty to disclose in its regulatory filings with the SEC all events described in this Complaint that it failed to disclose so that the Company's valuation and the common stock price would be based on accurate information and to preclude deceptive practices in the market.

70.     Each of the Individual Defendants further owed Sleep Number and the shareholders the duty of loyalty requiring that each favor Sleep Number's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

71.     At all times relevant hereto, the Individual Defendants were the agents of each other and Sleep Number and were at all times acting within the course and scope of such agency.

72.     The Individual Defendants had access to adverse, non-public information about the Company because of their advisory, executive, managerial, and directorial position with Sleep Number.

73.      The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Sleep Number.

**SLEEP NUMBER'S CODE OF CONDUCT AND CORPORATE GOVERNANCE**

74.    Sleep Number's Code of Conduct starts by saying:

It is Sleep Number's policy to observe and comply with all laws, rules and regulations applicable to the conduct of its business in all countries in which it operates and to require all Sleep Number team members, agents and representatives to avoid any activities that could involve Sleep Number in any unlawful practice. The involvement of Sleep Number team members, agents or representatives in, or the use of Sleep Number assets for any unlawful purpose is strictly forbidden. In addition, Sleep Number is committed to the highest standards of business and personal ethics, in order that Sleep Number and all of its team members, agents and representatives will rightfully earn and enjoy the trust and respect of customers, suppliers, business partners, investors, the business community, governmental and regulatory authorities, and the general public.

75.    The Code of Code of Conduct further avers that "[i]t is the personal responsibility of all Sleep Number team members, agents and representatives to:

- Acquaint themselves with the legal standards and restrictions applicable to their assigned duties and responsibilities, and to conduct themselves accordingly;

- Follow the advice of the Company's Chief Legal and Risk Officer or outside counsel when to do otherwise would lead to a violation of law or breach of our ethical standards; and

- Report suspected or apparent violations of laws or Company policies consistent with the direction provided by this Code.

76.    The Individual Defendants also had a prohibition against Insider Trading as set forth in the Company's Code of Conduct:

**Insider Trading**

Generally, it is unlawful for any person to buy or sell any stock of any publicly traded company while in possession of material, nonpublic information concerning the company. Sleep Number therefore maintains a policy that no Sleep Number team member, members of the Company's Board of Directors, or their respective family members or entities under their influence or control, may:

- Buy or sell any stock or other securities of Sleep Number at any time while in possession of material, nonpublic information about Sleep Number.

- Buy or sell any securities of any other entity while in possession of material,

20

nonpublic information about the other entity obtained through Sleep Number (such as information regarding purchases or sales of businesses or information obtained during the negotiation or implementation of contracts or other transactions with any such other entity).

• Disclose any such material, nonpublic information to any person outside of Sleep Number (including immediate family members) unless the Company's Chief Legal and Risk Officer authorize the disclosure in writing.

In addition to the general prohibition against trading in securities of Sleep Number or any other entity while in possession of material, nonpublic information, members of the Company's Board of Directors, officers, director level and above team members and other team members designated by Sleep Number from time to time whose duties regularly bring them into contact with confidential or proprietary information ("insiders") should only buy or sell securities of Sleep Number within open trading windows as specified in the Company's insider trading policy set forth in Sleep Number's Team Member Handbook. In addition, Sleep Number insiders are prohibited from pledging shares of the Company's stock or from engaging in any form of hedging transactions involving the Company's stock. In order to ensure compliance with these requirements, any insider of Sleep Number is required to notify the Company's Chief Legal and Risk Officer and obtain written approval prior to engaging in any transaction involving the purchase or sale of Sleep Number's securities.

77.     The Audit Committee Charter states, in pertinent part, that the primary purposes

of the Committee are to:

    a.  Assist the Board in fulfilling its oversight responsibilities with respect to:

        i.  The quality and integrity of the financial reports and other financial information provided by the Company to any governmental body or the public;

       ii.  The Company's compliance with legal and regulatory requirements that may have a material impact on the Company's financial condition or results of operations;

    b.  Prepare such report or reports, as may be required by applicable law, including without limitation the Committee report required for the annual proxy statement regarding the scope of the Committee's responsibilities and the manner of discharge of those responsibilities.

78.     The Audit Committee Charter also enumerates a number of responsibilities

which the Audit Committee has.  It states, in relevant part:

The primary responsibilities and duties of the Committee are to:

    c.  Monitor the Company's financial reporting processes and internal control systems;

79.    Relevant Audit Committee processes include but are not limited to:

(a) Review of Financial Statements and Related Matters

    1.  Review and discuss with management and the independent auditors the Company's annual financial statements and any other material financial information submitted to any governmental body, or the public, including any certification, report, opinion, or review rendered by the independent auditors, and recommend to the Board whether the Company's audited financial statements should be included in the Company's Annual Report on Form 10-K.

    4.  Review and discuss with management the Company's earnings press releases and earnings guidance prior to their release. The Chair of the Committee may represent the entire Committee for purposes of this review.

(c) Oversight of Financial Reporting Processes

    2.  Review and approve, at least annually, the Company's internal audit plan and receive quarterly reports with respect to the results of internal audits. Provide feedback and guidance to the leader of the internal audit function as needed with respect to internal audit activities.

    3.  Meet regularly with the leader of the internal audit function without any members of the Company's management team present.

(f) Oversight of Ethical and Legal Compliance

    1.  Establish, review and update periodically a code of ethics (the "Code") meeting the requirements of Item 406 of Regulation S-K of the Federal securities laws and ensure that management has established a system to enforce the Code.

    2.  Review management's monitoring of compliance with the Code.

    4.  Review and update periodically, with the Company's counsel, legal compliance matters including corporate securities trading policies and the status of the Company's compliance with Sarbanes-Oxley Section 404 requirements.

80.    The Individual Defendants violated the Code of Conduct, Company policy, and

the Company's corporate governance documents by engaging in or permitting the scheme to issue

materially false and misleading statements to the public, including in the Company's SEC filings and by facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, abuse of control, gross mismanagement, violations of the Exchange Act, and failing to report the same. Moreover, six of the Individual Defendants violated the Code of Conduct by selling Company shares at inflated prices. Further, in violation of the Code of Conduct and the Audit Committee Charter, the Individual Director Defendants failed to maintain internal controls, failed to maintain the accuracy of Company records and reports, and failed to comply with laws and regulations.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

81.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

82.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct were, among other things, to (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, and abuse of control; (ii) conceal adverse information concerning the Company's operations, financial condition, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

83.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or with gross negligence to engage in deceptive marketing, engage in improper accounting methods, conceal material facts, fail to correct such misrepresentations, and violate applicable laws. During

the Relevant Period, Individual Defendants collectively and individually initiated a course of conduct that was designed to and did engage in deceptive marketing. In furtherance of this plan, conspiracy, and course of conduct, Individual Defendants collectively and individually took the actions set forth herein. The Individual Defendants described herein was a direct, necessary, and substantial participant in the common enterprise, and/or common course of conduct complained here because the action described herein occurred under the authority and approval of the Board.

84.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in or substantially assisted the accomplishment of that wrongdoing and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

85.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and Sleep Number and was at all times acting within the course and scope of such agency.

## **BACKGROUND**

86.     Sleep Number Corporation was incorporated in 1987 and became publicly traded in 1998.  Company is listed on the Nasdaq Stock Market LLC (Nasdaq Global Select Market) under the ticker symbol "SNBR".  Sleep Number, along with its subsidiaries, provides sleep solutions, products, and services in the United States. The Company is well known for their Sleep Number 360® smart beds, which uses the SleepIQ® technology. Sleep Number 360® smart beds provide each sleeper with adjustable, personalized comfort for quality sleep. Sleep Number streamlines its operations by taking direct ownership of its production process rather than relying

on external contractors.  All products are sold directly to consumers through different available channels. The Company operates approximately 600 retail locations in all 50 states as of January 2021.

87.     To distinguish Sleep Number from competitors and to justify the Company's inflated stock price, Sleep Number touted that their "vertical integration" strategy was advantageous because it allowed for inventory optimization. In turn, it represented that its customer needs were met on a timely basis. For example, Sleep Number filed Annual Report Form 10-K with the SEC on February 20, 2020 ("2019 10-K"), which stated that "***Sleep Number's integrated supply chain is a competitive advantage***. [Company's] commitments to innovation and continuous improvement are employed to ***leverage our vertical-business model by optimizing culture, processes and technology***."  To satisfy investors regarding the demand hike during the pandemic, the Company said it had supposed "fail safes" to ensure timely arrivals of supplies and avoid any "unforeseen disasters."

88.     In addition, the 2020 10-K filed with the SEC on March 2, 2021 stated that ***[Company's]vertically integrated business model and role as the exclusive designer, manufacturer, marketer, retailer and servicer of Sleep Number® beds allows Sleep Number to offer consumers high-quality, individualized sleep solutions and services.***"

89.     Foam, a critical material and mattress component on which Sleep Number depends, is a petroleum-based substance created by reacting to specific chemicals in a strictly regulated process. A restricted number of North American-based suppliers supply the petrochemicals required in foam production, and these suppliers are concentrated in the states of Texas and Louisiana.  Without a steady and substantial supply of Foam, Sleep Number cannot produce mattresses needed to meet customer demand and a foam shortage would jeopardize its

brand, customer base, revenue, profits, and ability to meet analyst earnings estimates.

90.     On or around February 14, 2021, Winter Storm Uri pummeled the Gulf Coast of the United States, wreaking havoc on the states of Texas and Louisiana, among other places. More than 150 people died in Texas alone as a result of the hurricane, while millions of more lost power and water as a result of the disaster. The President of the United States approved emergency declarations for the states of Texas and Louisiana, which resulted in the deployment of federal equipment, supplies, and other resources to the impacted areas.

91.     Winter Storm Uri caused widespread damage to the local water and electricity infrastructure, causing oil refineries to shut down and disrupting the manufacture of petrochemical supplies. Foam was in short supply across the country because of the closure and work stoppages of plants in Texas and Louisiana.

92.     While the chemical polyol, one of two chemicals required to make foam, is made in several manufacturing facilities across the U.S., the majority are around the Gulf of Mexico. See https://hickoryrecord.com/news/local/furniture-industry-decimated-by-foam-shortage-after-texas-storm/article_cf71c222-8346-11eb-ab11-778cc906e6ae.html (last visited on February 2, 2022).  The second chemical, toluene diisocyanate (TDI), is made in the U.S. at only two facilities — one in Texas and one in Louisiana. *Id*.

93.     On February 19, 2021, less than a week after Winter Storm Uri, Defendant Harrison sold over $600,000.00 in Sleep Number stock.  On February 25, 2021, Defendant Nedorostek sold over $1,000,000.00 in stock.

94.     As a result of Winter Storm Uri and the plant closures, Sleep Number, and the rest of the furniture industry, encountered a significant supply chain interruption by the beginning of the Relevant Period, hampering the Company's ability to fill orders and meet growing

customer demand for its mattress product. Sleep Number was forced to delay mattress shipments to consumers, risking millions of dollars' worth of sales.

95.    Other furniture retailers were quick to recognize the devastating effect Winter Storm Uri would have on business and the foam supply chain. On March 12, 2021, Craftmaster furniture CEO Roy Calcagne called the situation: "terrible" and "[i]t's pretty much decimated our industry." Century Furniture CEO Alex Shuford was also quick to recognize the substantial blow to business stating as early as March 12, 2021: "It's a pretty bad situation." "It looks like shortages are going to last for a while and it's definitely going to impact almost all the factories in the upholstery industry around here in their ability to operate."

96.    However, Sleep Number refused to face reality and made no such concession, instead doubling down with false promises and half truths about its supply chain stream in its SEC filings claiming its "integrated supply chain" offered a "competitive advantage."

97.    However, the internal picture was not nearly as rosy as Sleep Number publicly represented, and despite reassuring investors about the Company's ability to weather the storm, the Insider Trading Defendants began to unload millions of dollars in Sleep Number stock at artificial highs.

98.    In fact, shortly after these assessments by other furniture retailers like Craftmaster and Century Furniture, Defendants Ibach, Callen, Vallete, Algere and Brown sold millions of dollars in of Sleep Number stock.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS

99.    On February 17, 2021, Sleep Number hosted an earnings call regarding fourth-quarter financial results for 2020. In her opening remarks, Defendant Ibach lauded Sleep Number's capacity to "manage inventory to support a more customer-focused supply chain."

Defendant Ibach touted that Sleep Number "delivered exceptional results by leveraging the power of vertical integration" and with ongoing consumer demand in the first quarter and solid growth plans in place, "[Sleep Number is] driving towards another year of breakthrough performance."

100.    Defendant Callen, despite a demand surge that interrupted Company's supply chain, gloated Sleep Number's ability to tackle the demand due to the Company's supply chain "flexibility and resilience."  He stated, in pertinent part:

> While explosive demand has certainly stressed our supply chain, we are benefiting from strong relationships with our global suppliers and are expediting components as needed to fulfill customers' desire for our proven quality sleep solutions. ***Despite our supply chain constraints and significant demand growth, customer delivery times are within six days of average as we employ enhanced digital inventory forecasting, inventory tracking and ingenuity of our teams and suppliers***. ***The flexibility and resilience we built into our global supply chain is also enabling rapid expansion of our fulfillment capacity,*** including the addition of 2 new assembly distribution centers in Dallas and Tampa here in the first quarter of 2021.

101.    The following day, on February 18, 2021, Sleep Number issued a press release filed with the SEC on Form 8-K, announcing the fourth quarter and 2020 financial results.  In the press release, the Company touted that "with strong momentum in the first quarter and ongoing investments in sleep science-based innovations and digital technologies, ***we are well-positioned to generate sustainable profitable growth for years to come***."

102.    On March 2, 2021, Sleep Number filed with the SEC its annual report on Form 10-K for the fiscal year ended January 2, 2021 (the "2020 10-K"). The 2020 10-K was signed by Defendants Valette, Ibach, Matas, Lauderback, Alegre, Kilpatrick, Howard, Nedorostek, Harrison, and Gulis and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Ibach and Callen attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud

committed by the Company, its officers, or its directors.

103. The 2020 10-K stated that "integrated supply chain" offered a "competitive advantage" and incorporated multiple fail-safes to thwart supply chain interruptions, claiming in pertinent part as follows:

> *Sleep Number's integrated supply chain is a competitive advantage*.
>
> In addition to a network of global suppliers, we currently operate two component manufacturing plants (Irmo, SC and Salt Lake City, UT) and four assembly distribution centers (Irmo, SC; Salt Lake City, UT; Ontario, CA; and Baltimore, MD) with two additional locations (Dallas, TX and Tampa, FL) opening in early 2021. Primary operations at the manufacturing sites include cutting and sewing of the fabric covers for our beds and final assembly and packaging of mattresses and bases. We also assemble our electrical Firmness Control™ systems in our Utah plant. *Our plants have consistently won awards for safety and manufacturing excellence. We also operate a national bedding fulfillment center in Minneapolis, MN.*
>
> We source the raw materials and components used in our products from third parties. *Various components are sourced from suppliers who currently serve as our sole or primary source of supply. We believe we can obtain these raw materials and components from other sources of supply, although we could experience short-term disruption in order fulfillment in the event of an unexpected loss of supply*. We have taken, and continue to take, various measures to mitigate the potential impact of an unexpected supply disruption from any sole-source or primary suppliers, including maintaining safety stocks and identifying potential alternate suppliers. *Our key suppliers have in place either contingency or disaster recovery plans or redundant production capabilities to minimize any unforeseen disasters.*

104. All the Defendant Directors signed the 10-K.

105. Although the 2020 10-K claimed that Sleep Number was "dependent" on third-party suppliers who "may" face business interruptions, it omitted to disclose that serious supply chain issues had already occurred, damaging the Company's sales results and capacity to satisfy growing customer demand.

106. This failure to disclose material adverse events violated Item 303(a)(3)(ii)'s

requirement for disclosure of "known trends or uncertainties . . . that registrant reasonably expects will have a material . . . unfavorable impact on . . . revenues . . . or income," and Rules 13a-14(a) and 15d-14(a) under the Exchange Act and SOX attesting to the accuracy of the financial statements contained in the 10-K, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

107.    On February 10, 2021, the SEC amendments to Regulation S-K became effective, which among other things amended Item 303(a)(3)(ii) to conform to Item 303(a)(1) (17 C.F.R. 229.303(a)(1)) and require disclosure of "events" which are "reasonably likely" to cause a material change in the relationship between costs and revenues.  The prior standard was "will cause."   In SEC Release No. 33-10890; 34-90459; SC 34100; File No. 57-01-20, the SEC explained that disclosure of "known trends" "should be made objectively and with a view to providing investors with a clearer understanding of the potential material consequences of known forward looking events or uncertainties."

108.    On April 21, 2021, Sleep Number issued a press release announcing its financial results for the first quarter ended March 31, 2021. The press release revealed that Sleep Number missed consensus sales projections for the quarter due to major supply chain interruptions.

109.    On this news, Sleep Number stock plummeted over 12% in a single day, closing at $110.13 per share on April 22, 2021, on an unusually high volume of over 2 million shares traded. The stock price remained artificially inflated because Individual Defendants refused to disclose the entire extent of Sleep Number's supply chain issues and instead continued to make materially false and misleading assertions regarding its business operations.

110.    Again, this news of downtrends with supply chain, production and inventory

shortfalls, core metrics for profitability and revenue, were required to be disclosed under Item 303(a)(3)(ii)'s requirement for disclosure of "known trends or uncertainties . . . that registrant reasonably expects will have a material . . . unfavorable impact on . . . revenues . . . or income."

111.    Later that same day, Sleep Number hosted a conference call with analysts and investors to discuss second-quarter results. During the call, Individual Defendants assured investors that the supply interruptions were only transitory and would be resolved in the second quarter. For example, Defendant Callen indicated in his prepared remarks that "***foam production is now expected to normalize by the end of Q2***." Similarly, in answer to an analyst inquiry, Defendant Callen indicated that Sleep Number's backlog would revert to a "more normal level" by the end of the second quarter. He stated the following:

> Directionally, we believe that our backlog will be more normalized, and we are experiencing pretty phenomenal demand, and that can always affect the timing of when deliveries are made, but that's how we're thinking about it. In terms of the supply chain challenges that caused a hiccup and making deliveries here in first quarter, we don't – we expect those to be resolved here in the second.

112.    An analyst subsequently inquired whether the Company's supply chain would be affected by any other factors. Callen refused to divulge any additional potential supply chain issues while assuring investors that the company possessed the flexibility to anticipate and mitigate issues, claiming in pertinent part:

> So look, this challenge isn't even the results of the foamers. It's not their problem. It's the challenge with the chemical producers. And you saw that's been a trifecta of bad luck for those for those producers. And they are coming back online, and their production capacity is very strong. And we expect here in the second quarter that, that's all stabilized. We've already seen some improvement in our delivery windows and our levels of service. And our first available date is about 17 days right now, and that compares to normally even around 14 days. So we're not that far off right now where we normally would be.
>
> ***So in terms of just our broader supply chain, we have great relationships with our suppliers. We have a very flexible supply chain***. We've been strategic about which parts of the business we have included in our vertical model. But these are

folks that specialize in different areas, and it makes sense for them to be in the
business they're in and us to be in ours. But we work really closely together, and
we have multiple factories across the country and around the globe. So we feel good
about our supply chain. It's not easy given the environment, but our teams are
managing it every day.

113.    After the April 21, 2021 conference call, Defendant Alegre sold over
$1,000,000.00 of Sleep Number stock.

114.    On July 20, 2021, Sleep Number issued a press release announcing its financial
results for the second fiscal quarter ended June 30, 2021.  The press release revealed that Sleep
Number missed forecast estimates, and the Company again attributed "near-term supply
constraints" and component shortages for the dismal results.

115.    Immediately following this announcement on July 21, 2021, the price of Sleep
Number stock plummeted approximately 13% in a single day to close at $97.78 per share on an
abnormally high volume of over 3 million shares traded, causing financial harm to investors.

## INSIDER SELLING

116.    Months before supply chain disruptions were fully disclosed by Sleep Number
and understood by the market, the Insider Trading Defendants Ibach, Callen, Valette, Alegre,
Nedorostek, Harrison and Brown, sold thousands of shares while in possession of material non-
public information regarding the Company's supply chain disruptions had on Sleep Number's
business growth and traded at high volume.  The Insider Trading Defendants sold these shares at
the Company's peak share price since going public in 1998.  Since offloading these shares during
the relevant period, the stock has continued to drop over the last year falling 33.58%.

117.    Defendant Ibach sold a total of 31,952 shares while the price of the Company's
stock was artificially inflated for approximately $4,583,007.84 in proceeds.  As Sleep Number's
Chief Executive Officer, Defendant Ibach possessed non-public information regarding the impact

supply chain disruptions had on Sleep Number's business growth and traded on such basis.

118.     Defendant Callen sold 13,087 shares while the price of the Company's stock was artificially inflated for approximately $1,809,507.69 in proceeds. As the Company's President and Chief Financial Officer, Defendant Callen possessed insider information regarding the Company's inadequate inventory and supply chain and traded while in possession of this material non-public information.

119.     Defendant Valette sold stock while in possession of adverse material non-public information less than a month before the Company would disclose that information to the public. Defendant Valette sold 25,000 shares for approximately $3,469,154 in proceeds. As the Chairman of the Board, Defendant Valette possessed insider information regarding the Company's supply chain disruptions had on Sleep Number's business growth and traded on such basis.

120.     Defendant Alegre sold stock while in possession of adverse material non-public information less than twos month before the Company would disclose that information to the public. Defendant Alegre sold 12,852 shares for approximately $1,382,232.60 in proceeds. As a member of the Management Development and Compensation Committee, Defendant Alegre possessed insider information regarding the Company's supply chain disruptions had on Sleep Number's business growth and traded on such basis.

121.     Defendant Nedorostek sold stock while in possession of adverse material non-public information less than a month before the Company would disclose that information to the public. Defendant Nedorostek sold 7,370 shares for approximately $1,018,835.40 in proceeds. As a member of the Management Development and Compensation Committee, Defendant Nedorostek possessed insider information regarding the Company's supply chain disruptions had

on Sleep Number's business growth and traded on such basis.

122.     Defendant Harrison sold stock while in possession of adverse material non-public information less than a month before the Company would disclose that information to the public. Defendant Harrison sold 5,366 shares for approximately $636,844.97 in proceeds. As a member of the Corporate Governance and Nominating Committee and Management Development and Compensation Committee, Defendant Harrison possessed insider information regarding the Company's supply chain disruptions had on Sleep Number's business growth and traded on such basis.

123.     Defendant Brown sold stock while in possession of adverse material non-public information before the Company would disclose that information to the public. Defendant Brown sold 13,891 shares for approximately $1,769,287 in proceeds. As the Chief Marketing Officer, Defendant Brown possessed insider information regarding the Company's supply chain disruptions had on Sleep Number's business growth and traded on such basis.

**Summary of the Individual Defendants' Wrongful Conduct**

124.     The Individual Defendants breached their fiduciary duties because they allowed or permitted the Company to disseminate false and misleading statements. Additionally, the Company's SEC filings and omissions caused the above-discussed internal failures caused or allowed the illicit activity described in this Complaint.

125.     The Individual Defendants breached their fiduciary duties to Sleep Number because they willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact regarding, at least press releases, earning calls, Forms 8-K, 10-K, Proxy Statement and analyst interviews described in this complaint. Defendants signed and authorized the SEC filings that were false and misleading because the

Defendants falsely stated/or failed to disclose the following on their watch: the Company's suffered severe supply chain disruptions due to Winter Storm Uri, and as a result of Sleep Number's failure to properly implement a fail-safe and lack of redundancies, the Company was forced to scale back manufacturing, resulting in decreased profitability.

126.    Redundancies, often known as backup systems, provide for the continuation of business operations and functions in the event of a failure or act of nature. It also allows for the continued operation of a desired function even when a fault has been detected. If Sleep Number had integrated fail-safe or redundancies regarding the foam supply, they could have prevented the supply disruption and maintained continuity of service, including the demand surge.

127.    This resulted in significantly lower revenue, profits and earnings. Considering the above, the Company missed its projections for the second quarter of 2021.

128.    On July 20, 2021, Sleep Number announced its financial results for its second fiscal quarter ended June 30, 2021, revealing it had missed consensus estimates on the top and bottom line for the quarter and blaming the disappointing results in significant part on "near-term supply constraints" and component shortages. On this news, the price of Sleep Number stock fell nearly 13%, to close at $97.78 per share on July 21, 2021.

**DAMAGES TO SLEEP NUMBER**

129.    Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

130.    As a direct and proximate result of the Individual Defendants' conduct, Sleep Number will lose and expend many millions of dollars.

131.    The Insider Trading Defendants have misappropriated insider information to enrich themselves and their insider trading profits must be disgorged to the Company.

132.     Such expenditures include, but are not limited to, legal fees associated with the federal securities lawsuit filed against the Company, its Chief Executive Officer, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

133.     Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

134.     As a direct and proximate result of the Director Defendants' conduct, Sleep Number has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Director Defendants' breaches of fiduciary duties.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

135.     Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

136.     A pre-suit demand on the Board is futile and, therefore, excused. At the time of filing of this complaint, the Board consists of the following twelve individuals: Defendants Valette, Ibach, Mendez, Matas, Lauderback, Alegre, Kilpatrick, Howard, Nedorostek, Harrison, Gulis and non-defendant directors Eyler and Mendez.  Plaintiff needs only to allege demand futility as to six of twelve Directors on the Board at the time of the filing of this complaint.

137.     During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of ten members, Defendants Valette, Ibach, Matas, Lauderback, Alegre, Kilpatrick, Howard, Nedorostek, Harrison, and Gulis (the "Relevant Period Director Defendants").

138.     Demand is excused as to all the Relevant Period Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to engage in the misconduct, including signing the 2020 10-K, and to make false and misleading statements and omissions of material fact while five of them engaged in insider sales, with no directors objecting to the insider sales, based on material non-public information, all of which renders the Directors unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

139.     In complete abdication of their fiduciary duties, the Relevant Period Director Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appearing more profitable and attractive to investors. While investors were duped into believing the fraud perpetrated by the Individual Defendants, five of the Directors sold Company stock at artificially inflated prices based on inside information. As a result of the foregoing, the Relevant Period Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

**Defendant Ibach**

140.     Defendant Ibach is not disinterested or independent, and therefore, is incapable of considering demand because as President, Chief Executive Officer and director, Defendant Ibach is responsible for creating an environment that is more conducive to objective evaluation and oversight of management's performance, increasing management accountability and improving the ability of the Board to monitor whether management's actions are in the best

interests of the Company and its stockholders. Defendant Ibach signed, and thus personally made the false and misleading statements in the 2020 10-K and recklessly allowed other members of the board to disseminate that Sleep Number was not experiencing supply chain disruptions that would affect the Company's profitability and business operations.

141.    In addition, Defendant Ibach engaged in corporate misconduct by violating Sleep Number's insider trading policy because she possessed non-public information regarding the supply chain disruption and its impact on the Company's business growth and engaged in self self-dealing by trading on such information.

142.    Defendant Ibach, while in possession of material non-public information, sold a minimum of 31,952 shares of the Company's stock at various prices per share for a windfall of $4,583,007.8 and this sale demonstrates her motive in facilitating and participating in the fraud. As a result of her insider selling, Defendant Ibach may be personally subject to disgorgement.

143.    This lack of independence and financial benefits received by Defendant Ibach render her incapable of impartially considering a demand to commence and vigorously prosecute this action.

144.    For these reasons, Defendant Ibach breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

**Defendant Valette**

145.    Defendant Valette is not disinterested or independent, and therefore, is incapable of considering demand because as Chairman of the Board, Defendant Valette is responsible for creating an environment that is more conducive to objective evaluation and oversight of management's performance, increasing management accountability and improving the ability of

the Board to monitor whether management's actions are in the best interests of the Company and its stockholders. Defendant Valette signed, and thus personally made the false and misleading statements in the 2020 10-K and recklessly allowed other members of the board to disseminate that Sleep Number was not experiencing supply chain disruptions that would affect the Company's profitability and business operations.

146.    In addition, Defendant Valette engaged in corporate misconduct by violating Sleep Number's insider trading policy because he possessed non-public information regarding the supply chain disruption and its impact on the Company's business growth and engaged in self self-dealing by trading on such basis.

147.    Defendant Valette sold a minimum of 25,000 shares of the Company's stock at $137.69 a share for a windfall of $3,469,154 and this sale demonstrates her motive in facilitating and participating in the fraud.  As a result of his insider selling, Defendant Valette may be personally subject to disgorgement.

148.    This lack of independence and financial benefits received by Defendant Valette render him incapable of impartially considering a demand to commence and vigorously prosecute this action.

149.    For these reasons, Defendant Valette breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

**<u>Defendant Harrison</u>**

150.    Defendant Harrison is not disinterested or independent, and therefore, is incapable of considering demand because Defendant Harrison is responsible for creating an environment that is more conducive to objective evaluation and oversight of management's

performance, increasing management accountability and improving the ability of the Board to monitor whether management's actions are in the best interests of the Company and its stockholders. Defendant Harrison signed, and thus personally made the false and misleading statements in the 2020 10-K and recklessly allowed other members of the board to disseminate that Sleep Number was not experiencing supply chain disruptions that would affect the Company's profitability and business operations.

151.    Defendant Harrison engaged in corporate misconduct by violating Sleep Number's insider trading policy because he possessed non-public information regarding the supply chain disruption and its impact on the Company's business growth and engaged in self self-dealing by trading on such basis.

152.    Defendant Harrison sold a minimum of 5,366 shares of the Company's stock for a windfall of $636,844.97 and this sale demonstrates his motive in facilitating and participating in the fraud.  As a result of his insider selling, Defendant Harrison may be personally subject to disgorgement.

| Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| February 19, 2021 | 3,469 | $118.48 | $411,007.12 |
| February 19, 2021 | 1,897 | $119.05 | $225,837.85 |
| Total Proceeds | | | $636,844.97 |

153.    As a member of the Management Development and Compensation Committee, Defendant Harrison was charged with evaluating the CEO's performance, and his failure to properly do so makes him especially culpable for the wrongful conduct described herein. He conducted little, if any, oversight of the Company's performance and shareholder return. He consciously disregarded his duties to consider a number of factors when assessing the incentive component of executive compensation because Defendant Harrison relied on certain financial

metrics, such as the impact of the COVID-19 pandemic had on Sleep Number's business growth.

154.    In addition, Defendant Harrison is not disinterested or independent, and therefore, is incapable of considering demand because he served on the Nominating and Corporate Governance Committee, and as part of his duty, he was required to provide a review, guidance, and oversight for the overall operations of a corporation or business. He failed to review regulatory developments and governance best practices that would best serve the interest of Sleep Number stakeholders. Good corporate governance leads to ethical business practices, which leads to financial viability. Defendants Harrison failed to ensure redundancies and fail-safes in their vertical integration process, which left Sleep Number's business operations susceptible to streamline disruptions.

155.    This lack of independence and financial benefits received by Defendant Harrison render him incapable of impartially considering a demand to commence and vigorously prosecute this action.

156.    For these reasons, Defendant Harrison breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

**Defendant Nedorostek**

157.    Defendant Nedorostek is not disinterested or independent, and therefore, is incapable of considering demand because Defendant Nedorostek is responsible for creating an environment that is more conducive to objective evaluation and oversight of management's performance, increasing management accountability and improving the ability of the Board to monitor whether management's actions are in the best interests of the Company and its stockholders. Defendant Nedorostek signed, and thus personally made the false and misleading

statements in the 2020 10-K and recklessly allowed other members of the board to disseminate that Sleep Number was not experiencing supply chain disruptions that would affect the Company's profitability and business operations.

158.     In addition, Defendant Nedorostek engaged in corporate misconduct by violating Sleep Number's insider trading policy because she possessed non-public information regarding the supply chain disruption and its impact on the Company's business growth and engaged in self self-dealing by trading on such information.

159.     Defendant Nedorostek sold a minimum of 7,370 shares of the Company's stock for a windfall of $$1,018,835.40 and this sale demonstrates her motive in facilitating and participating in the fraud.  As a result of her insider selling, Defendant Nedorostek may be personally subject to disgorgement.

160.     This lack of independence and financial benefits received by Defendant Nedorostek renders her incapable of impartially considering a demand to commence and vigorously prosecute this action.

161.     For these reasons, Defendant Nedorostek breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

**<u>Defendant Alegre</u>**

162.     Defendant Alegre is not disinterested or independent, and therefore, is incapable of considering demand because Defendant Alegre is responsible for creating an environment that is more conducive to objective evaluation and oversight of management's performance, increasing management accountability and improving the ability of the Board to monitor whether management's actions are in the best interests of the Company and its stockholders. Defendant

Alegre signed, and thus personally made the false and misleading statements in the 2020 10-K and recklessly allowed other members of the board to disseminate that Sleep Number was not experiencing supply chain disruptions that would affect the Company's profitability and business operations.

163.    In addition, Defendant Alegre engaged in corporate misconduct by violating Sleep Number's insider trading policy because he possessed non-public information regarding the supply chain disruption and its impact on the Company's business growth and engaged in self self-dealing by trading on such information.

164.    Defendant Alegre sold a minimum of 12,852 shares of the Company's stock for a windfall of $1,382,232.60 and this sale demonstrates his motive in facilitating and participating in the fraud.  As a result of his insider selling, Defendant Alegre may be personally subject to disgorgement.

165.    As a member of the Management Development and Compensation Committee, Defendant Alegre was in charge of evaluating the CEO's performance, and his failure to properly do so makes him especially culpable for the wrongful conduct described herein. He conducted little, if any, oversight of the Company's performance and shareholder return. He consciously disregarded his duties to consider a number of factors when assessing the incentive component of executive compensation because Defendants Alegre relied on certain financial metrics, such as the supply chain disruptions that halted Sleep Number's productions and lowered profit margins.

166.    This lack of independence and financial benefits received by Defendant Alegre renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.

167.    For these reasons, Defendant Alegre breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

**Defendant Lauderback**

168.    Defendant Lauderback is not disinterested or independent, and therefore, is incapable of considering demand.  As a member of the Management Development and Compensation Committee, Defendant Lauderback was in charge of evaluating the CEO's performance, and her failure to properly do so makes her especially culpable for the wrongful conduct described herein. She conducted little, if any, oversight of the Company's performance and shareholder return. She consciously disregarded her duties to consider a number of factors when assessing the incentive component of executive compensation because Defendant Lauderback relied on certain financial metrics, such as the supply chain disruptions that halted Sleep Number's productions and lowered profit margins.

169.    Defendant Lauderback signed, and thus personally made the false and misleading statements in the 2020 10-K and recklessly allowed other members of the board to disseminate that Sleep Number was not experiencing supply chain disruptions that would affect the Company's profitability and business operations.

170.    This lack of independence and financial benefits received by Defendants Lauderback renders her incapable of impartially considering a demand to commence and vigorously prosecute this action.

171.    For these reasons, Defendant Lauderback breached her fiduciary duties, faces a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile and, therefore, excused.

**Defendant Kilpatrick**

172.    Defendant Kilpatrick is not disinterested or independent, and therefore, is incapable of considering demand because she served on the Audit Committee during the wrongdoing, including throughout 2021 and up to the present day. Pursuant to the Audit Committee's Charter, the purpose of the Committee is to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, accounting, legal, regulatory, and public disclosure requirements.  Thus, Defendant Kilpatrick was responsible for knowingly or recklessly allowing the improper statements related to the flexibility and resilience of Sleep Number's vertical integration strategy, as it relates to the foam supply chain. Further, Defendant Kilpatrick reviewed and approved the improper press releases made to the public. Despite her knowledge or reckless disregard, this Defendant caused these improper statements.

173.    In addition, Defendant Kilpatrick is not disinterested or independent and, therefore, is incapable of considering demand because she served on the Nominating and Corporate Governance Committee, and as part of her duty, he was required to provide a review, guidance, and oversight for the overall operations of a corporation or business. She failed to review regulatory developments and governance best practices that would best serve the interest of Sleep Number's stakeholders. Good corporate governance leads to ethical business practices, which leads to financial viability.  Defendant Kilpatrick failed to ensure redundancies and fail-safes in their vertical integration process, which left Sleep Number's business operations susceptible to streamline disruptions.

174.    Defendant Kilpatrick signed, and thus personally made the false and misleading statements in the 2020 10-K and recklessly allowed other members of the board to disseminate that Sleep Number was not experiencing supply chain disruptions that would affect the

Company's profitability and business operations.

175.    This lack of independence and financial benefits received by Defendant Kilpatrick render them incapable of impartially considering a demand to commence and vigorously prosecute this action.

176.    For these reasons, Defendants Kilpatrick breached her fiduciary duties, faces a substantial likelihood of liability, are not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

**Defendants Matas, Howard and Gulis**

177.    Defendants Matas, Gulis and Howard are not disinterested or independent, and therefore, are incapable of considering demand because they also serve on the Audit Committee.

178.    Matas (Chair), Gulis and Howard served on the Audit Committee during the wrongdoing, including throughout 2021 and up to the present day.

179.    Pursuant to the Audit Committee's Charter, the purpose of the Committee is to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, accounting, legal, regulatory, and public disclosure requirements.  Thus, Defendants Matas, Howard, and Gulis were responsible for knowingly or recklessly allowing the improper statements related to the flexibility and resilience of Sleep Number's vertical integration strategy, as it relates to the foam supply chain. Further Defendants Matas, Howard and Gulis should have or did review and approve the improper press releases made to the public.  Despite their actual knowledge or reckless disregard, these Defendants caused these improper statements.

180.    Defendants Matas, Howard and Gulis signed, and thus personally made the false and misleading statements in the 2020 10-K and recklessly allowed other members of the board to disseminate that Sleep Number was not experiencing supply chain disruptions that would affect

the Company's profitability and business operations.

181.     This lack of independence and financial benefits received by Defendants Matas, Howard, and Gulis render them incapable of impartially considering a demand to commence and vigorously prosecute this action.

182.     For these reasons, Defendants Matas, Howard, and Gulis breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile and, therefore, excused.

183.     The Relevant Period Director Defendants, as members of the Board, were and are subject to the Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations. The Code of Conduct requires the Relevant Period Director Defendants to adhere to Sleep Number's standards of business conduct. The Relevant Period Director Defendants did not comply with the requirements of the Code of Conduct.  The Relevant Period Director Defendants violated the Code of Conduct because they knowingly or recklessly engaged in and facilitated the misconduct alleged herein and participated in making and/or causing the Company to make the materially false and misleading statements alleged herein.  Because the Relevant Period Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

184.     The Relevant Period Director Defendants conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Relevant Period Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a

substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

185.    The acts complained of herein constitute violations of fiduciary duties owed by the Relevant Period Director Defendants, and these acts are incapable of ratification.

186.    The Relevant Period Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds i.e., monies belonging to the stockholders of Sleep Number. If there is a directors' and officers' liability insurance policy covering the Relevant Period Director Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Relevant Period Director Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Relevant Period Director Defendants were to sue themselves or certain of the officers of Sleep Number there would be no directors' and officers' insurance protection.  Accordingly, the Relevant Period Director Defendants cannot be expected to bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Relevant Period Director Defendants is futile and, therefore, excused.

187.    If there is no directors' and officers' liability insurance, then the Directors will not cause Sleep Number to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as

well.

188.     Thus, for all of the reasons set forth above, all of the Relevant Period Director Defendants, and, if not all of them, certainly at least six of them, cannot consider a demand with disinterestedness and independence.   Consequently, a demand upon the Board is excused as futile.

## COUNT I

### AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES

189.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

190.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Sleep Number's business and affairs.

191.     Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision. The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Sleep Number.

192.     In breach of their fiduciary duties owed to Sleep Number, the Individual Defendants willfully or recklessly caused the Company to violate federal regulations by falsely stating and/or failing to disclose the Company's true business performance, as alleged herein.

193.     The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct those

public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Sleep Number's securities.

194.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to engage in the fraudulent schemes set forth herein improperly and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to engage in the fraudulent schemes improperly and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Sleep Number's securities.

195.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

196.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Sleep Number has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## <u>COUNT II</u>

## AGAINST INDIVIDUAL DEFENDANTS FOR WASTE OF CORPORATE ASSETS

197.    Plaintiff incorporates by reference and re-alleges each and every allegation set

forth above, as though fully set forth herein.

198.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Sleep Number to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to overpay for Sleep Number's stock during the portion of the Relevant Period that at least included the period from February 2021 to July 2021, while the stock price was artificially inflated due to the false and misleading statements and omissions that the Individual Defendants made and/or caused the Company to make, and to lose assets from investors and customers who no longer trust the Company.

199.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

200.    Plaintiff on behalf of Sleep Number has no adequate remedy at law.

### **COUNT III**

**AGAINST THE INSIDER TRADING DEFENDANTS FOR
BREACH OF FIDUCIARY DUTIES AND DISGORGEMENT**

201.    Plaintiff incorporates by reference and reallege each and every allegation set forth above, as though fully set forth herein.

202.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Insider Selling Defendants were unjustly enriched at the expense of, and to the detriment of, Sleep Number.

203.    The Insider Trading Defendants had access to non-public information concerning Sleep Number.

204.    The Insider Trading Defendants are fiduciaries of Sleep Number, possessed material, non-public information of Sleep Number, and used that information improperly in selling

Sleep Number stock because they were motivated, in whole or in part, by the substance of that material, non-public information of Sleep Number, and acted with scienter.

205.    The Insider Trading Defendants profited from their misconduct and their exploitation of material and adverse inside information.

206.    The other Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Sleep Number that was tied to the performance or artificially inflated valuation of Sleep Number, or received compensation or other payments that were unjust in light of the Defendants' bad faith conduct.

207.    Plaintiff, as the representative of Sleep Number, seeks disgorgement of all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Insider Trading Defendants due to their wrongful conduct and breach of their fiduciary duties.

208.    Plaintiff, on behalf of Sleep Number, has no adequate remedy at law.

## COUNT IV

### AGAINST DEFENDANTS FOLEY AND WOODWORTH FOR CONTRIBUTION UNDER SECTIONS 10(B) AND 21D OF THE EXCHANGE ACT

209.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

210.    Sleep Number, along with Defendants Ibach and Callen are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder.

211.    If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due

to Defendants Ibach and Callen's willful and/or reckless violations of their obligations as controlling shareholder, officers, and/or director of Sleep Number.

212.    Defendants Ibach and Callen, because of their positions of control and authority as controlling shareholder, officers, and/or director of Sleep Number, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs Sleep Number, including the wrongful acts complained of herein and in the Securities Class Action.

213.    Accordingly, Defendants Ibach and Callen are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

214.    As such, Sleep Number is entitled to receive all appropriate contribution or indemnification from Defendants Ibach and Callen.

## RELIEF REQUESTED

WHEREFORE, Plaintiff demands judgment as follows:

A.    Determining that this action is a proper derivative action, that demand is excused, and certifying Plaintiff as an appropriate representative of Sleep Number for the action;

B.    Finding that each of the Insider Trading Defendants breached their fiduciary duties as controlling stockholders and/or directors of the Company;

C.    Finding that each of the Director Defendants breached their fiduciary duties either as an officer and/or director of the Company;

D.    Finding that the Officer Defendants breached their fiduciary duties as an officer of the Company;

E.      Awarding the Company the disgorgement of all insider trading profits from the Insider Selling Defendants, and from their affiliates, including all profits, benefits and other compensation obtained by their insider trading and further profits flowing therefrom;

F.      Directing each of the Defendants to account to Sleep Number for all damages sustained or to be sustained by the Company and all profits, gains, and benefits obtained by the Defendants by reason of the wrongs alleged herein and awarding the Company all such damages against the Defendants;

G.      Directing each of the Defendants to pay pre- and post-judgment interest at the highest rate allowable by law on the amount of damages sustained by the Company because of Defendants' actions as described herein;

H.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

I.      Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: May 12, 2022                    **REINHARDT WENDORF & BLANCHFIELD**

      /s/Garrett D. Blanchfield
Garrett D. Blanchfield, (#209855)
Brant D. Penney, (#316878)
332 Minnesota Street, Suite W-1050
St. Paul, MN 55101
Telephone: (651) 287-2100
E-mail: g.blanchfield@rwblawfirm.com
          b.penney@rwblawfirm.com

*Counsel for Plaintiff*

OF COUNSEL:

**SQUITIERI & FEARON, LLP**
Lee Squitieri
424 Madison Avenue, 3rd Floor
New York, New York 10017
(212) 421-6492

**MOORE KUEHN, PLLC**
Fletcher Moore
Justin Kuehn
30 Wall Street, 8th Floor
New York, New York 10011
(212) 709-8245